HEWLETT-PACKARD CO., PLAINTIFFS *v.* UNITED STATES, DEFENDANT

Court No. 93–01–00058

■■■■■■■■■■■■■■■■■■■■■■■■■

(Dated June 12, 1998)

*Baker & McKenzie (William D. Outman, II)* and *Mark F. Ryan*, Int'l Trade Counsel, Hewlett-Packard Co., of counsel, for plaintiffs.

*Frank W. Hunger*, Assistant Attorney General, *Joseph I. Liebman*, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, Department of Justice *(Bruce N. Stratvert) (Robert F. Altneu*, Office of Assistant Commissioner Regulations & Rulings, and *Sheryl A. French*, Office of Assistant Chief Counsel International Trade Litigation, U.S. Customs Service, of counsel, on the brief) for defendant.

## MEMORANDUM OPINION

DICARLO, *Senior Judge:* Plaintiff, Hewlett-Packard Co., challenges the classification by the United States Customs Service of small-format desktop pen plotters entered between May 10, 1991 and October 28, 1992. Customs classified the merchandise as drawing, marking-out or mathematical calculating instruments, at a duty of 5.8% *ad valorem.* Harmonized Tariff Schedule of the United States (HTSUS) § XVIII, ch. 90, subheading 9017.20.8090 (1991 & 1992 Supp. 1). Plaintiff asserts that the merchandise should have been classified as automatic data processing machines: output units, at a duty of 3.7% *ad valorem. Id.* § XVI, ch. 84, subheading 8471.92.9060. The court has jurisdiction under 28 U.S.C. § 1581(a) (1994).

## PROPOSED CLASSIFICATIONS

Customs classified the imported merchandise under the following subheading:

> Drawing, marking-out or mathematical calculating instruments (for example, drafting machines, pantographs, protractors, drawing sets, slide rules, disc calculators); instruments for measuring length, for use in the hand (for example, measuring rods and tapes, micrometers, calipers), not specified or included elsewhere in this chapter; parts and accessories thereof:
>> Other drawing, marking-out or mathematical calculating instruments:
>>> Other:
>>>> Other: .................................. 5.8%

HTSUS § XVIII, ch. 90, subheading 9017.20.8090 (1991 & 1992 Supp. 1). Plaintiff proposes the following alternative:

> Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included:

Other:
> Input or output units, whether or not entered with the rest of the system and whether or not containing storage units in the same housing:
>> Other:
>>> Other:
>>>> Other:
>>>>> Other:
>>>>>> Output devices: ............... 3.7%

*Id.* § XVI, ch. 84, subheading 8471.92.9060.

### FACTUAL FINDINGS

Customs' factual conclusions are presumed to be correct, and plaintiff has the burden of proving otherwise. 28 U.S.C. § 2639(a)(1) (1994). Where there is no factual dispute between the parties, the presumption is irrelevant, *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483–84 (Fed. Cir. 1997), but where disputed questions of fact exist, the plaintiff must demonstrate to the court that Custom's findings are incorrect, *Totes, Inc. v. United States*, 69 F.3d 495, 498 (Fed. Cir. 1995).

Bearing this standard in mind, after hearing the trial testimony presented, and after considering the exhibits and papers filed, the court makes the following findings:

viii. The merchandise consists of four models of desktop pen plotters: the Hewlett-Packard 7440A, 7475A, 7550A, and 7550B. (Donald Basta Test., Tr. at 1–15 to 1–16.)

ix. The plotters are used to produce detailed business-related graphics, such as charts, graphs, or diagrams. (*Id.* at 1–28; Lindsay Passmore Test., Tr. at 1–93 to 1–94; Pl.'s Ex. 4, 9.) They do so by moving pens and paper or other media along an x- and a y-axis, lowering the pens to mark the paper or other media in the appropriate areas. (Basta Test., Tr. at 1–29; Donald Herzog Test., Tr. at 2–19.)

x. The plotters have media transport mechanisms. (*See* Basta Test., Tr. 1–27 to 1–29; Herzog Test., Tr. at 2–24.) The 7440A accepts only letter-size media, while the 7475A, 7550A, and 7550B accept letter-size and 11x17 inch media. (Basta Test., Tr. at 1–35 to 1–36.)

xi. The plotters can produce text by tracing the outline of individual letters, but are not a practical means of creating large amounts of text, particularly at small sizes. (*Id.* at 1–40, 1–59 to 1–60; Herzog Test., Tr. at 2–25 to 2–26.)

xii. Users create graphics by using specially designed software installed on an automatic data processing machine, or computer. (*Id.* at 1–21 to 1–22.) The computer and plotter are connected by a cable that transfers data from one to the other. (*Id.* at 1–20.) The pens then move according to the signals received from the computer. (Herzog Test., Tr. at 2–60.)

xiii. A user may also move the pens manually by pushing controls on the face of the plotter. It is not practical to create an entire graphic manually. (Basta Test., Tr. at 1–64 to 1–66, 1–76 to 1–77.)

xiv. The plotters cannot create graphics, other than a "demo page," unless they are connected to a computer. (*Id.* at 1–22.)

xv. The plotters can be connected to a variety of different data processing machines, both personal computers and workstations. (*Id.*)

xvi. The plotters have been used for business graphics, CAD/CAM, scientific engineering, and technical graphics. They were primarily sold to the general business and corporate graphics markets. (Passmore Test., Tr. at 1–90 to 1–94, 1–141 to 1–142.)

## DISCUSSION

The presumption of correctness in 28 U.S.C. § 2639(a)(1) is not relevant to the question of whether Customs correctly interpreted the HTSUS because the meaning of a tariff term is a question of law that the court must review *de novo*. 28 U.S.C. § 2643(b) (1994); *Rollerblade*, 112 F.3d at 484; *Totes*, 69 F.3d at 498. In doing so, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 880 (Fed. Cir. 1984).

## I.

In cases decided under the TSUS, the court held that x-y plotters similar to those at issue were not "drafting and drawing machines," as argued by the government, because their principal function was not to assist designers in the actual drafting process. *Sumitronics, Inc. v. United States*, 19 CIT 122, 124, 17 ITRD 1107, 1109 (1995); *see also Apple Computer, Inc. v. United States*, 14 CIT 77, 86, 12 ITRD 1178, 1184 (1990). The plotters were not used to create drawings but merely served as printers, recording material previously created on a data processing machine. *Sumitronics*, 19 CIT at 124, 17 ITRD at 1109; *Apple Computer*, 14 CIT at 86, 12 ITRD at 1184. As computer output devices, they were properly classifiable as "office machines not specially provided for" under TSUS item 676.30. *Apple Computer*, 14 CIT at 88, 12 ITRD at 1185.

The reasoning in those earlier cases remains persuasive. Decisions interpreting the TSUS are not dispositive in interpreting the HTSUS. "Nevertheless, on a case-by-case basis prior decisions should be considered instructive * * *, particularly were the nomenclature previously interpreted in those decisions remains unchanged and no dissimilar interpretation is required by the text of the HTS[US]. *Conference Report on the Omnibus Trade Act of 1988*, H.R. Conf. R. No. 576, at 549–50 (1988). The TSUS provision rejected by the court in *Sumitronics* and *Apple Computer* read as follows:

Drafting machines, compasses, dividers, ruling pens, lettering pens (including fountain-pen type) used by draftsmen, pantographs, drawing curves, rulers, scribers, straight edges, disc calculators, slide rules, and other instruments, all the foregoing which are drawing, marking-out or mathematical calculating instruments; hand styluses; micrometers, calipers, gauges, balancing machines, and non-optical measuring or checking instruments, apparatus,

and machines not specially provided for; and parts of the foregoing articles:
    Other:
        Drafting and drawing machines, instruments, and apparatus, and parts thereof ........................ 5.9%

Tariff Schedules of the United States Annotated (TSUS), schedule 7, pt. 2, subpt. C, item 710.80 (1984). The language is nearly identical to that found in the HTSUS, with slight differences in organization. Nothing in the text of the HTSUS suggests that Congress intended the term "drawing or drafting machine" to have a new interpretation. Neither does anything in its legislative history. *See* H.R. Conf. R. No. 576 at 549–50 (conversion from TSUS to HTSUS intended to be essentially revenue neutral), *cited in Hemscheidt Corp. v. United States*, 18 CIT 641, 644, 858 F. Supp. 223, 227 (1994), *aff'd*, 72 F.3d 868 (Fed. Cir. 1995); United States Int'l Trade Comm'n, *Continuity of Import and Export Trade Statistics After Implementation of the Harmonized Commodity Description and Coding System*, USITC Pub. No. 2051 annex I at 295–97, annex II at 305 (1988) (nonbinding suggested cross-reference tool equating TSUS item 710.80 with HTSUS heading 9017). There is no significant distinction between the TSUS and the HTSUS provisions, and the court finds no reason to alter its prior conclusion that x-y plotters are not classifiable as drawing or drafting machines. For the reasons discussed in *Sumitronics* and *Apple Computer*, therefore, Customs' classification of the merchandise under HTSUS subheading 9017.20.8090 was incorrect.

II.

Several HTSUS headings correspond to the broad TSUS category of "office machines not specially provided for." TSUS schedule 6, pt. 4, subpt. G, item 676.30 (1984). Plaintiff suggests that the x-y plotters should be classified as computer "output devices" under HTSUS heading 8471. In choosing among HTSUS headings, classification in the tariff schedule is determined "according to the terms of the headings and any relative section or chapter notes." HTSUS General Rules of Interpretation ¶ 1. Chapter 84 Note 5(B) provides that an automatic data processing machine may consist of a system of "separately housed units." HTSUS § XVI, ch. 84, note 5(B). An item is such a "unit" if it is: 1) able to connect to the central processing unit (CPU), 2) specifically designed to be part of such a system, and 3) capable of accepting or delivering data used by the system (except for power supply units). *Id.* The item may not be a machine "incorporating or working in conjunction with an automatic data processing machine and performing a specific function." *Id.*

The Hewlett Packard x-y plotters meet the criteria listed in Chapter Note 5(B). The plotters connect to various CPUs by cable. (Basta Test., Tr. at 1–20.) They are designed to work with a CPU, and have no use other than as part of a computer system. *(See id.* at 1–22.) They are capable of accepting data transmitted by a CPU and converting it to printed form. (Herzog Test., Tr. at 2–60.) These are all characteristics of an auto-

matic data processing machine "unit." It is also apparent that the plotters are not limited to a single specialized function. When linked to a CPU, they may be used for several purposes, including CAD/CAM, business graphics, and scientific engineering. (Passmore Test., Tr. at 1–90 to 1–94, 1–141 to 1–142.) After considering the testimony and exhibits presented at trial, the court concludes that the plotters are appropriately classified under heading 8471.

The final step in the classification process is to determine which subheading of heading 8471 applies. Plaintiff has suggested subheading 8471.92.9060 (other: input or output units: other: other: other: other: output devices). A better alternative, however, is subheading 8471.92.6580 (other: input or output units: other: printer units: assembled units incorporating at least the media transport, control and print mechanisms: other). Classification of goods among subheadings is determined "according to the terms of those subheadings and any related notes [as well as by the general rules of interpretation], on the understanding that only subheadings at the same level are comparable." HTSUS General Rules of Interpretation ¶ 6. At the most specific level, subheadings 8471.92.9060 and 8471.92.6580 refer to "assembled printer units: other" and to "other: output devices." Both provisions accurately describe the plotters, which are computer output devices that incorporate media transport, (see Basta Test., Tr. at 1–27 to 1–29; Herzog Test., Tr. at 2–24), control, (Basta Test., Tr. at 1–64 to 1–66, 1–76 to 1–77), and print mechanisms, (Herzog Test., Tr. at 2–19). In choosing among alternatives, "the [sub]heading which provides the most specific description shall be preferred to [sub]headings providing a more general description." HTSUS General Rules of Interpretation ¶ 3(a); see id. ¶ 6 (applying general rules to subheadings). The term "assembled printer unit" is more specific than the residual term "other." The preferred classification, then, is subheading 8471.92.65. Within that subheading, x-y plotters fall under the residual category .6580 (other). Cf. HTSUS 8471.92.6520 (daisy wheel), .6540 (dot matrix), .6560 (laser printers).

CONCLUSION

It is the determination of the court that Customs incorrectly classified the x-y plotters identified as Hewlett-Packard models 7440A, 7475A, 7550A, and 7550B. The plotters are properly classifiable as "automatic data processing machines and parts thereof" under HTSUS 8471.92.6580.